IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
-------------------------------------------------   :
EDWARD PATRICK,                                     :  CASE NO.  1: 05 CV 2791
                                                    :
                              Plaintiff,            :
                                                    :  MEMORANDUM OF OPINION AND
              -vs-                                   :  ORDER GRANTING DEFENDANTS'
                                                    :  MOTION FOR SUMMARY JUDGMENT
                                                    :  AND DENYING PLAINTIFF'S MOTION
CLEVELAND SCENE PUBLISHING, et                       :  FOR PARTIAL SUMMARY JUDGMENT
al.,                                                :
                                                    :
                              Defendants.           :
-------------------------------------------------
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS


        Plaintiff Edward Patrick (hereinafter "Dr. Patrick") initiated this defamation suit

against the defendants Cleveland Scene ( the "Scene") and Thomas Francis ("Mr.

Francis") (cumulatively "the Defendants"), the publisher and author, respectively, of a

27 October 2004 cover story article entitled *Playing Doctor*.  Dr. Patrick seeks

compensation under theories of defamation, invasion of privacy by disclosure of private

facts, and false light invasion of privacy.  Dr. Patrick specifically maintains that the

publication of *Playing Doctor* falsely suggests that his resume is misleading, that he did

not possess the requisite qualifications to appear as an emergency room physician, that

his board certification process was fraudulent, that he failed to properly fulfill his

residency, and that he does not possess the proper medical credentials.  (Doc. 96:

Second Amended Complaint).

-1-

The Defendants have now filed a Motion for Summary Judgment (Doc. 116) to which Dr. Patrick has filed a response (Doc. 126), and the Scene has replied (Doc. 128).  In addition, Dr. Patrick has filed a motion for partial summary judgment (Doc. 115), to which the Scene has responded (Doc. 125), and Dr. Patrick has replied (Doc. 127).

For the reasons discussed below, the Court will grant the Defendants' motion for summary judgment and deny the plaintiff's motion for partial summary judgment.

## I.      BACKGROUND

This suit centers on the representations made in the cover article, *Playing Doctor,* by Thomas Francis, in the 27 October 2004 issue of the Scene.  The subject of that article, Dr. Patrick, maintains the article's discussion of his qualifications and medical training, beginning with his medical residency from 1975 to 1976, harmed his reputation when it raised questions about his research activities in connection with Dr. Henry Heimlich, the form and location of his medical residency, and his training in emergency medicine.

The article, *Playing Doctor*, reported on an investigation of the scope of Dr. Patrick's presence at Cincinnati, Ohio's Jewish Hospital in the mid 1970's after his graduation from medical school.  *Playing Doctor* relied upon contemporary news articles, hospital records, interviews with the hospital's chief physicians present during that period, various public records from state medical licensing boards and hospitals at which Dr. Patrick worked, and an interview with Peter Heimlich, the son of Dr. Heimlich.  The article raised questions regarding Dr. Patrick's medical residency credentials during

-2-

the time he also worked for Dr. Heimlich as a computer researcher and for Purdue University as a professor of electrical engineering.  The article alleged "what appears to be a phantom residency at Jewish Hospital."  The thrust of the article focuses on Dr. Patrick's credentials and the plaintiff's relationship with Dr. Heimlich during and after the development of the Heimlich Maneuver – a widely recognized technique used to respond to choking victims and as a secondary response for clearing the lungs in drowning cases.

The article goes on to allege misrepresentations made by Dr. Patrick in his medical credentials, including his claims of the following: a full professorship at Indiana University; a special emergency medicine residency under Dr. Heimlich; a residency at Deaconess Hospital in Cleveland, Ohio;  a residency in emergency medicine at the University of Cincinnati Hospital; a residency in emergency medicine at Purdue University Hospital; and, serving as the guiding hand in establishing the family residency program at St. Luke's Hospital in Solon, Ohio.

With regard to Dr. Patrick's representations, *Playing Doctor* notes that: Indiana University only has record of the plaintiff working as an unpaid volunteer not a full professor; plaintiff's claimed special emergency training, from 1976 to 1978, under Dr. Heimlich was disavowed by Dr. Heimlich; Deaconess Hospital did not have a residency program during the period claimed by Dr. Patrick; hospital executives at the University of Cincinnati found no evidence of Dr. Patrick's residency; Purdue University has neither a medical school nor a hospital; and, according to hospital sources at St. Luke's, Dr. Patrick did not "establish" a family residency program when he was on faculty at that hospital.

-3-

The article also discusses Dr. Patrick's job movement among various hospital emergency rooms across a number of states, traces the number of hospitals and staffing agencies which have sought to verify the plaintiff's emergency medicine residency, surgical residency, and multi-year residency.  The article also points to Dr. Patrick's use of a significantly incorrect birth-date, making himself younger by ten years, for medical licenses in three separate states.

From the record, it is clear that the genesis of the October, 2004, *Playing Doctor* article emerged from and built upon an earlier investigative story about Dr. Heimlich and the Heimlich Maneuver, written by Mr. Francis for the 11 August 2004 edition of the <u>Scene</u>, entitled *Heimlich's Maneuver*.  During the course of writing that article on Dr. Heimlich's efforts to apply the Heimlich Maneuver to drowning victims, a controversial application within the emergency medical community, Mr. Francis learned of the plaintiff's past collaborations with Dr. Heimlich, and of Dr. Patrick's report in the Journal *Emergency* in 1981, regarding the use of the maneuver to save a young drowning victim in Lima, Ohio.  (Doc. 116, Ex. 115).  During the research for the *Heimlich's Maneuver* article, Mr. Francis interviewed Dr. Patrick.  In the interview the plaintiff emphasized the integral role he held in the development of the Heimlich Maneuver.  In conversation with Mr. Francis, Dr. Patrick referred to the Heimlich Maneuver as more accurately the "Patrick – Heimlich Maneuver."

Subsequent to his publication of his article *Heimlich's Maneuver*, Mr. Francis turned to an investigation of Dr. Patrick's relationship with Dr. Heimlich.  (Doc. 116, Francis Aff., 9, 13-14).  While it appears from the record that Mr. Francis' initial interest in Dr. Patrick's claims regarding his medical training were sparked by research done by

Dr. Heimlich's son, Peter Heimlich, it is equally clear that Mr. Francis reviewed a plethora of documents and interviewed over a dozen people for information on Dr. Patrick's medical training which began under the auspices of Dr. Heimlich in 1975. (Doc. 116, Francis Aff., 16).  *Playing Doctor*, the emergent article upon which this action is based, stated that while Dr. Patrick did receive a residency certificate from Jewish Hospital, fellow residents did not recall his participation in the residency program.  Mr. Francis quoted Dr. Gordon Margolin, Chief of Internal Medicine at Jewish Hospital during Dr. Patrick's residency, as finding the plaintiff's presence "evanescent," which is to say infinitesimal.  Mr. Francis reported that Dr. Margolin refused to sign Dr. Patrick's residency completion certificates on behalf of the hospital.  (Doc. 116, Margolin Depo. Tr. 39-54).

The record indicates that Dr. Patrick's comments to Mr. Francis during the investigative leg of the *Heimlich's Maneuver* article were consonant with a litany of public actions, carried out by Dr. Patrick in an effort to garner public recognition for what he maintained was his longstanding role in the development of the Heimlich Maneuver. Public notice was taken of Dr. Patrick's arrival in Cincinnati, Ohio in 1975 to work with Dr. Heimlich and Neil Armstrong in publications of The American Israelite, The Lafayette Journal Courier, The Cincinnati Enquirer, and a Xavier University press release.  (Doc. 116, Ex. 50, 113; Doc. 116, Ex. A, F, G).

The record further indicates that Dr. Patrick played an active part in promoting the Heimlich Maneuver and his own role in developing the technique.  He has written articles promoting the application of the technique in the case of drowning victims, as he did in the 1981 journal Emergency, regarding a drowning victim in Lima, Ohio.  (Doc.

-5-

116, Ex. 115).  Dr. Patrick provided statements to a Lima newspaper regarding that case.  (Doc. 116, Ex. 114).  Dr. Patrick has appeared on local and national television, alone and with Dr. Heimlich, in a series of efforts to promote the Heimlich Maneuver.  (Doc. 116, Patrick Depo. Tr. 320-21).  Dr. Patrick also co-authored two articles with Dr. Heimlich promoting the technique, in 1988, focusing on its use in drowning, and in 1990, focusing on choking.  (Doc. 116, Exh. I, J).   Dr. Patrick and Dr. Heimlich together made numerous other public appearances on behalf of the Heimlich Maneuver both before and after the endorsement of the technique by Surgeon General C. Everett Koop.  (Doc. 116, Ex. H, K, L, M, Heimlich Depo. Tr. 156, Patrick Depo. Tr. 116, 313-16).  In response to reporting on the development of the Heimlich Maneuver in the Cincinnati Enquirer, Dr. Patrick issued a press release in 2003 which stated, "I have always viewed that Dr. Heimlich and I worked together to develop what has become known as the Heimlich maneuver just as the Wright Brothers worked together to develop the first flying machine."  (Doc. 116, Ex. 54).  Dr. Patrick was further quoted in the March-April 2004 Cornell Alumni Magazine as having "jointly developed what would be called the Heimlich maneuver."  (Doc. 116, Ex. O).

According to the record, at the time of the publication of Playing Doctor, the plaintiff had just successfully completed a contract working in two hospitals in Cape Fear, North Carolina, and voluntarily remained unaffiliated with the Linde Health Care group that had placed him under the Cape Fear contract.  (Doc. 116, Patrick Depo. Tr. 484-87).  Dr. Patrick then affiliated himself with NES Healthcare Group ("NES") which in early 2005 placed him at Cumberland County Hospital in Kentucky.  In March 2005, the CEO of Cumberland received a packet of derogatory information regarding Dr. Patrick

from an anonymous source.  Among other primary documents, the packet contained an unsigned letter questioning the plaintiff's medical residency and medical credentials, a copy of *Playing Doctor*, and a copy of two postings – "Drowning in Lies," and "Bogus Credentials" – from Peter Heimlich's website.  (Doc. 116, Ex. Q).  Dr. Patrick testified that the Cumberland CEO met with him and assured the plaintiff that his position in the hospital was secure.  (Doc. 116, Patrick Depo. Tr. 387).

Dr. Patrick continued to work at Cumberland through August, 2006, at which time the new Cumberland CEO asked NES to remove the plaintiff from the emergency department of the hospital.  That request to NES came as a result of an investigation into complaints by the Cumberland medical staff and negative findings about Dr. Patrick's work performance.  (Doc. 116, Ex. R).

As a result, Dr. Patrick affiliated himself with Sterling Healthcare which placed him at Scott Memorial Hospital in Indiana.  On 14 September 2005, several months after Dr. Patrick began at Scott Memorial, the hospital received an anonymous package of documents similar to that sent to Cumberland, including a copy of *Playing Doctor* and twenty-five pages from Peter Heimlich's website.  (Doc. 116, Ex. U).  After receiving the package, the CEO of Scott Memorial began an independent investigation in which he found Dr. Patrick's residency was not actually in emergency medicine, that the plaintiff did not work well with staff, and that he did not follow proper sterilization procedures between patients.  (Doc. 116, Ex. V, W).  Dr. Patrick testified that he continues to be placed at medical facilities by Interim Physicians and also obtains work from Medical Doctors Associates, Team Health, and TIVA Healthcare.  (Doc. 116, Patrick Depo. Tr. 444, 500-515; Ex. 141, 148, 150).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323;  see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir.1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)).  Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995).  Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 56. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

-8-

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) (marking as standard that the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff").  The nonmovant must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. (quoting in part Anderson, 477 U.S. at 257); see Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  The nonmoving party "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment."  Moore v. Philip Morris Co., 8 F.3d 335, 339-40 (6th Cir. 1993).

Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.  See Anderson, 477 U.S. at 248.  If the nonmovant fails to present such affirmative evidence, then there is no need for a trial since there are no "genuine factual issues that properly can be resolved only by a finder of fact." Anderson, 477 U.S. at 247-48; see Celotex, 477 U.S. at 322-23.

Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).


### III.    LAW AND ARGUMENT

### A.    Plaintiff has the Burden of Proving the Falsity of the Article

Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."  Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc., 81 Ohio App.3d 591, 611 N.E.2d 955, 962 (Ohio Ct. App.1992) (internal quotation marks omitted). "Because the determination of whether words are defamatory is a question of law, summary judgment is appropriate in defamation actions."  Brown v. Lawson, 169 Ohio App.3d 430, 863 N.E.2d 215, 219 (Ohio Ct. App.2006).

Longstanding precedent establishes that, in seeking damages against media defendants on a matter of public concern, the plaintiff in a defamation suit carries the burden of proving allegedly defamatory statements false by clear and convincing

-10-

evidence.  Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986); Frey v.

Multimedia, Inc., 42 F.3d 1388 (6th Cir. 1994).  See also Milkovich, v. Lorain Journal

Company, 497 U.S. 1, 19 (1990) (recognizing that statements on matters of public

concern must be established as false before liability under state defamation law may

attach).  Under Ohio law, a private individual asserting a defamation claim against a

media defendant,

> must prove by clear and convincing evidence that the defendant failed to
> act reasonably in attempting to discover the truth or falsity or defamatory
> character of the publication.

Lansdowne v. Beacon Journal Publishing Co., 32 Ohio St.3d 176, 180, 512 N.E.2d 979

(1987).  The Ohio Supreme Court views "clear and convincing evidence" as

> that measure ... of proof which is more than a mere 'preponderance of
> evidence,' but not to the extent of such certainty as is required 'beyond a
> reasonable doubt' in criminal cases, and which will produce in the mind of
> the trier of facts a firm belief or conviction as to the facts sought to be
> established.

Id. at 180-81, 512 N.E.2d 979 (citation omitted).[1]

Courts have, further, recognized that in proving falsity, libel plaintiffs must

establish a substantial and material difference between the complained of language and

the truth.  Schiavone Construction Co. v. Time, Inc., 847 F.2d 1069, 1083 (3rd Cir.

1988).  The United States Supreme Court finds an article or report substantially true

where the imputation, the "gist" or "sting," of the contested statement is true.  Masson v.

New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991).  In ascertaining the imputation of

---

[1] While the Lansdowne court explicitly noted that in private figure/media
defamation cases, "actual malice need not be proven," as this Court discusses
below, Dr. Patrick is a limited-purpose public figure in this instance, requiring that
he show actual malice.  Id. at 181, 512 N.E.2d 979.

an article, courts are directed to view the disputed publication as a whole. <u>See</u> <u>Orr v.</u>
<u>The Argus-Press Co.</u>, 586 F.2d 1108, 1112 (6th Cir. 1978) (finding truth established as a
matter of law where the article contains the gist of the truth as "ordinarily understood"
and rejecting a standard that "the literal truth be established in every detail"); <u>Crall v.</u>
<u>Gannett Satellite Information Network, Inc</u>., 1992 WL 400713, *3-4 (S. D. Ohio 1992);
 <u>Painter v. E. W. Scripps Co.</u>, 104 Ohio App. 237, 241 (1957).

In *Playing Doctor*, the main imputation of the article is twofold: the reported
character of Dr. Patrick's 1975 -1976 residency at Jewish Hospital raised questions
about the degree of his participation in and the thoroughness of his residency training;
and, Dr. Patrick's representations of his medical training were either exaggerated or
inaccurate.

Both of these imputations are matters of public concern.  In the context of the
First Amendment, a matter of public concern arises as "a subject of legitimate news
interest; that is, a subject of general interest and of value and concern to the public at
the time of publication."  <u>City of San Diego, Cal. v. Roe</u>, 543 U.S. 77, 83-84 (2004).
"Whether ... speech addresses a matter of public concern must be determined by [the
expression's] content, form, and context ... as revealed by the whole record."  <u>Dunn &</u>
<u>Bradstreet, Inc. v. Greenmoss Builders, Inc</u>., 472 U.S. 749, 761 (1985) (brackets and
ellipses in original, internal quotation marks omitted).  Although Dr. Patrick contends
that the character of his medical training and his representation of his experience
through his resume are not matters of public concern (Doc. 126), the Court finds that
contention untenable.  Not only is the matter of Dr. Patrick's medical training an area of
public concern, but the plaintiff himself has relied upon the representation of his training

and experience to gain access to public forums, especially when discussing the genesis, development, dissemination and application of the exceedingly familiar Heimlich Maneuver.

Upon a review of the record, the Court finds both of the imputations from the article substantially true – that Dr. Patrick engaged in misrepresentations of his medical training, and questions remain regarding the extent of his participation in a residency program while assigned to Jewish Hospital in 1975-76.  Here the Court does not encroach upon the province of the jury, Bruss v. Vindicator Printing Co., 109 Ohio App. 3d 396, 400 (7th Dist. 1996), but instead concludes that, as a matter of law, Dr. Patrick has failed to carry his prima facie burden establishing the element of falsity as required under the First Amendment.

Dr. Patrick failed to carry that burden because significant unrebutted assertions remain regarding the articles first imputation that the plaintiff misrepresented his medical training.  From the record it appears substantially true that Dr. Patrick's assertion that he conducted research on the Heimlich Maneuver prior to his residency at Jewish Hospital was misleading.  (Doc. 116, Heimlich Depo. Tr. 34-35).  Equally left unrebutted are the article's assertions both that Dr. Patrick inaccurately claimed his residency at Jewish Hospital was designed for emergency medicine or in emergency medicine, and that he claimed incorrect dates for his residency.  (Doc. 116, Bowen Depo. Tr. P. 183; Margolin Depo. Tr. 38, 60-62; Heimlich Depo. Tr. 118, 136, 127-28, 180; Ex. 5, 7, 14, 18-20, 23, 52, 53, 88, 89, 90, 91). The plaintiff did not rebut the article's observation that Dr. Patrick shaved ten years from his age by using false birth dates on his medical licenses in Kentucky, West Virginia, and Alabama, as well as on his application to take his

-13-

emergency medicine boards.[2]  (Doc. 116, Ex. 72, 101-04, 106-08).  Finally, left unrebutted are the article's observations that Dr. Patrick misrepresented his medical training when he claimed to have held a full professorship at Indiana University Medical Center (Doc. 116, Ex. 73, 92, 100), and that he singularly began the emergency medicine department at St. Luke's Hospital. (Doc. 116, Ex. 89, 90, 91, 92, 99).[3]

Further, Dr. Patrick has failed to establish the falsity of the article's second imputation by clear and convincing evidence.  The second imputation focused on Dr. Patrick's participation in the residency program at Jewish Hospital and raised questions about the form of his participation and whether the residency was properly completed. That imputation was predicated on several sources: the lack of documentation at Jewish Hospital where Dr. Patrick's file lacks actual rotations or evaluations; published reports

_____

[2]The Court notes, from the record, that a risk manager for Dr. Patrick's former employer NES Healthcare Group recommended cancelling his contract in the Spring of 2006 upon the discovery that the Plaintiff's medical licenses relied upon conflicting birth dates, noting "[m]inimally, this physician has 'lied' on hospital and license applications regarding his DOB.  This alone is grounds for cancelling his contract."  (Doc. 116, Ex. S).

[3]These unrebutted assertions in *Playing Doctor* are enough to establish the truth of the imputation that Dr. Patrick misled in representing his medical training.  The Court recognizes that Dr. Patrick has provided rebuttal argument regarding other aspects of the article, specifically claiming he was not misleading in describing his rotating residency as having taken place at both Jewish Hospital and the University of Cincinnati, that the deposition of Dr. Peter Franklin supported his assertion that he 'established' the family residency program at St. Luke's Hospital, and, that his description of having participated in a "special residency program in emergency medicine" was a specific term used by the American Board of Emergency Medicine.  (Doc. 126).  Having reviewed these rebuttals, the Court does not find they establish, in the face of the record, the falsity of the publication by clear and convincing evidence.  (Doc. 116, Ex. D; Margolin Depo. Tr. 53, 58, 59; Canestri Depo. Tr. 27-28; Heimlich Depo. Tr. 58, 141; Doc. 125: Ex. 108).

-14-

on Dr. Patrick's speciality as an electrical engineer and the computer research role he was to fulfill in Dr. Heimlich's lab; evidence of Dr. Patrick's competing outside activities at Purdue University and far-flung speaking engagements during his residency; and, interviews with hospital staff, including with Dr. Margolin, the then-Chief of Internal Medicine, who refused to sign Dr. Patrick's residency certificates.  (Doc. 116, Ex. 35, 36, 55, 56, 72, 80, 82, 85-90, 93, 113; Margolin Depo. Tr. 28-29, 39-46; Heimlich Depo. Tr. 149-52).

Dr. Patrick has sought to rebut the evidence underlying this second imputation. He has provided the affidavit of a fellow engineering student, Ramasamy Uthurusamy, who worked with Dr. Patrick, but who did not personally observe the plaintiff working as a resident.  (Doc. 126).  Ultimately, Mr. Uthurusamy's testimony is consistent with Mr. Francis' notes that the affiant joined Dr. Patrick at Jewish Hospital after the plaintiff had finished his residency when he was fully dedicated to performing only research.  (Doc. 116, Ex. WWW).  Dr. Patrick's rebuttals regarding his conflicting conferences and his efforts to recharacterize Dr. Margolin's and Dr. Canestri's deposition testimony is unavailing.  (Doc. 126; Doc. 116, Patrick Depo. Tr. 189-93; Margolin Depo. Tr. 39-46; Canestri Depo. Tr. 33-54).  The Court does not find that Dr. Patrick's rebuttals have provided clear and convincing evidence of the falsity of the article's second imputation regarding the scope of the Plaintiff's residency at Jewish Hospital.


**B.      Limited-Purpose Public Figure**

The Defendants maintain that Dr. Patrick is a public figure, which elevates the fault standard in a libel suit.  The plaintiff maintains he is simply a practicing physician.

When the plaintiff is a "public figure," he or she must also establish that the defendant published the defamatory statement "with 'actual malice,' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Herbert v. Lando, 441 U.S. 153, 156 (1979) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)).  Whether Dr. Patrick is a public figure remains a question of law to be determined by the courts.  Marcone v. Penthouse Int'l, 754 F.2d 1072, 1081 n. 4 (3rd Cir. 1985);  see also Cobb v. Time, Inc., 278 F.3d 629, 637 (6th Cir. 2002) ("The unique nature of the interest protected by the actual malice standard requires that reviewing courts conduct an independent review to determine whether that standard has been met.").

The United States Supreme Court has explained that public figures include those who achieve fame "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).  Courts recognize that a plaintiff can be either a limited-purpose public figure or a general-purpose public figure.  A plaintiff may be regarded as a limited-purpose public figure with respect to "a limited range of issues," in which he or she has "voluntarily injected himself [or herself] ... into a particular public controversy." Gertz, 418 U.S. at 351.  A general-purpose public figure is one who attains "such pervasive fame or notoriety that he becomes a public figure for all purpose and in all contexts." Id.

Analyzing whether a plaintiff is a limited-purpose public figure proceeds in two stages.  Clark v. ABC, Inc., 684 F.2d 1208, 1218 (6th Cir. 1982) (citing Gertz, 418 U.S.

-16-

at 345, 352). "First, a 'public controversy' must exist." Id. "Second, the nature and extent of the individual's involvement in the controversy must be ascertained." Id.

In assessing whether a public controversy exists, the Court is mindful that "all controversies of interest to the public" are not "public controversies" within the meaning of Gertz. Id. Rather, a "public controversy" is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." Waldbaum v. Fairchild Pub., Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980). It is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." Id.; accord Lundell Mfg. Co., Inc. v. ABC, Inc., 98 F.3d 351, 363 (8th Cir.1998).

In the second stage, the Court considers three factors in ascertaining the nature and extent of a plaintiff's participation in a public controversy: "first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy." Clark, 684 F.2d at 1218 (citing Gertz, 418 U.S. at 344-45, and Wolston v. Reader's Digest Assoc., Inc., 433 U.S. 157, 165-68 (1979)).

With these standards in mind, the Court concludes that Dr. Patrick qualifies as a limited-purpose public figure. Based on the record evidence, a reasonable jury would have no choice but to conclude that a public controversy existed prior to the publication of *Playing Doctor,* over the development, acceptance, public implementation, and specific application of the Heimlich Maneuver and the place of Dr. Patrick's participation in all phases of that widely recognized emergency procedure.

-17-

The record indicates that Dr. Patrick has continued to voluntarily inject himself into the controversy.  Prior to the publication of the article under dispute in this instance, in May 2003, Dr. Patrick issued a press release touting his role in the development of the Heimlich Maneuver (Doc. 116, Ex. 54); discussed his role in the development of the Heimlich Maneuver with the Cornell Alumni Magazine for its May/April 2004 edition (Doc. 116, Ex. O); asked the CEO of the Lima Hospital in September 2004 to make the case records of the Lima case available to the public because of recent public interest (Doc. 116, Ex. BB); discussed the Lima case on his newly launched website in the Fall of 2004; and retained a public relations firm to represent his interests in the controversy.

Moreover, Dr. Patrick's limited-purpose public figure status has not faded over time.  The United States Supreme Court has explicitly reserved the question of "whether or when an individual who was once a public figure may lose that status by the passage of time."  Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 166 n.7 (1979).  In Wolston the District of Columbia Circuit found that plaintiff was a public figure and retained that status for the purpose of later discussion of the espionage case in which he was called as a witness.  The United States Supreme Court found that the plaintiff's role in the original public controversy was so minor that he was not a public figure.  It therefore reserved the question of whether a person retains his or her public figure status.

Even assuming Dr. Patrick has accurately represented his current status as "nothing more than a practicing doctor," that development would not erase his status as a limited-purpose public figure.  In Street v. National Broadcasting Co., 645 F.2d 1227, 1235 (6th Cir. 1981), the Court found the status of the limited-purpose public figure

-18-

endured for purposes of later commentary on the particular controversy.  In Street, the

Court explained that the

> [p]laintiff argues that even if she was a public figure at the time of the
> 1930s [Scottboro] trial, she lost her public figure status over the
> intervening forty years.  We reject this argument and hold that once a
> person becomes a public figure in connection with a particular
> controversy, that person remains a public figure thereafter for purposes of
> later commentary or treatment of that controversy. This rule finds support
> in both case law and analysis of the constitutional malice standard.

The Court notes, in response to Dr. Patrick's reliance on authority from other

jurisdictions, that the holding in Street is controlling in this matter as that decision

specifically concludes that a limited-purpose public figure does not lose his or her status

through the passage of time, as it relates to the specific controversy.  (Doc. 126, p 31-

32).  The record indicates that the article, *Playing Doctor*, arose from an earlier

examination of the questions involved in the Lima case and the role Dr. Patrick

performed in the development and acceptance of the Heimlich Maneuver.  Under the

opinion in Street, that connection alone would be enough to sustain Dr. Patrick's limited-

purpose public figure status.

Dr. Patrick maintains an unreasonably narrow reading of his status as a limited-

purpose public figure.  Upon review of the record, the Court does not find credible the

plaintiff's argument that he should be considered a public figure only for purposes of

commentary touching on his research into the Heimlich Maneuver.  (Doc. 126, p. 29).

Dr. Patrick has voluntarily injected himself into the controversy over the development of

the Heimlich Maneuver, publicly analogizing his relationship with Dr. Heimlich in the

development of the Heimlich Maneuver as equivalent to that of the Wright Brother's in

the development of the airplane.  Secondly, Dr. Patrick has publicly promoted the

-19-

Heimlich Maneuver and defended its use in the controversial Lima case.  Finally, the nature of the plaintiff's background and expertise – as both a medical doctor and holding a doctorate in electrical engineering –  lent weight to his research this area, and bolstered the gravitas of his public advocacy for the Heimlich technique.

The article under dispute examined Dr. Patrick's medical training, his role in the development of the Heimlich Maneuver, and the use of the Heimlich Maneuver for drowning victims – the Lima case.  As such, *Playing Doctor* considered the character of the plaintiff's medical training as it touched upon a controversy in a public arena in which Dr. Patrick has purposefully exercised an extended engagement.

**C.     Plaintiff does not Establish Actual Malice by Clear and Convincing Evidence**

As a limited-purpose public figure, Dr. Patrick must establish actual malice on the part of the Defendants by clear and convincing evidence.  <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. at 793.  The Sixth Circuit has established the standard for reviewing a plaintiff's defamation claims under actual malice, in <u>Orr</u>, where the court explained:

> This case suggests that courts must be cautious about letting libel cases go to the jury under the malice standard where there is no proof that the reporter or his [or her] newspaper knew or suspected that the statements in his [or her] article were false.  'If the circumstances relied on as showing malice are as consistent with its non-existence as with its existence, the plaintiff has not overcome the presumption of good faith and there is nothing for the jury.'

Orr v. Argus-Press Co., 586 F.2d at 1114, quoting Raymond v. Croll, 233 Mich. 268, 275-76, 206 N.W. 556, 558 (1925).

Proving actual malice requires Dr. Patrick to show that Mr. Francis subjectively possessed a "high degree of awareness . . . of probable falsity." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 91989), quoting Garrison v. Louisiana, 379 U.S. 64, 74 (1964).  This rather broad standard turns on whether proof is put forth that a defendant entertained serious doubts regarding the truth of a publication. Courts in general, and the Sixth Circuit in particular, will not find actual malice where a plaintiff, such as Dr. Patrick, is portrayed in a negative manner, or even where a defendant has failed to investigate prior to publication, so long as there is insufficient evidence to show the defendant "in fact entertained serious doubts as to the truth of the publication."  Perk v. Reader's Digest Association, 931 F.2d 408, 412 (6th Cir. 1991); Harte-Hanks, 491 U.S. 688.

Dr. Patrick maintains the Defendants committed actual malice by allegedly failing to conduct a thorough investigation into the certification process controlled and overseen by the American Board of Emergency Medicine ("ABEM"), prior to the publication of *Playing Doctor*.  (Doc. 126, Ex. G, H).  Yet, Mr. Francis' failure to investigate the board certification process, to the plaintiff's satisfaction, has no bearing on establishing actual malice where it is clear from the record that Mr. Francis: did investigate the board certification process; knew the ABEM's physician's files were confidential; and, conveyed that Mr. Patrick was board certified pursuant to the plaintiff's representation that he completed the residency at Jewish Hospital.  (Doc. 116' Francis Aff. ¶¶ 35, 38; Doc. 125, Ex. ZZZ).

-21-

In this instance, the subjective test for actual malice remains whether Mr. Francis "entertained serious doubts about the truth of his publication" knowing that Dr. Patrick had received board certification from ABEM.  The fact that Dr. Patrick received a residency completion certificate, signed by Dr. Heimlich (Doc. 116, Ex. 37), upon which basis the ABEM might award board certification, does not engender the "serious doubts" necessary toward the truth or falsity of an article whose main imputation is to question the degree of Dr. Patrick's participation as a medical resident at Jewish Hospital from 1975 to 1976.  The countervailing record is replete with testimony substantiating the 'gist' of the <u>Scene</u> article's position regarding Dr. Patrick's marginal participation in the medical residency program; a state of affairs which culminated in the refusal by the chief resident, Dr. Margolin, to sign Dr. Patrick's residency completion certificates on behalf of the hospital.  (Doc. 116, Margolin Depo. Tr. 46).[4]

Further, a review of the record indicates Dr. Patrick fails to meet the clear and convincing standard necessary to establish actual malice on the part of the Defendants. For instance, Dr. Patrick's extensive allegations regarding the influence of Peter Heimlich, Dr. Heimlich's son, on the shape of the article, *Playing Doctor*, is not borne out upon a comparison of Mr. Francis' interview notes with the published information that Mr. Francis was able to verify through other sources and public records.  (Doc. 126,

---

[4]Dr. Patrick also maintains, as evidence of actual malice, that Mr. Francis unfairly excluded the publication of positive facts regarding the plaintiff.  (Doc. 126).  Because the issue in this defamation suit is whether the publisher recklessly or knowingly published false material, the question of fairness involving Dr. Patrick, as a limited purpose public figure, has no legal weight.  <u>See</u> <u>Perez v. Scripps-Howard</u>, 35 Ohio St. 3d 215, 219. (Noting that "[f]airness in journalism is a laudable goal but it is not a condition precedent to First Amendment protection").

pp. 17-21; Doc. 116, Ex. WWW; Ex. 61; Francis Aff. ¶ 30).  The Court finds no material

evidence in this review to substantiate Dr. Patrick's allegation that Mr. Francis "simpl[y]

reli[ed] on someone else's statement."  (Doc. 126, p. 33).  Further, the record indicates

no intentional confusion on the part of Mr. Francis in conveying Dr. Patrick's residency

period between 1974 and 1976, as that confusion is reflected in Dr. Patrick's self-

representation through his resumes and hospital records.  (Doc. 126, pp. 2, 3, 10, 11;

Doc. 116, Table 1 referenced exhibits; Ex. 41, 55).  A comparison between the content

of *Playing Doctor*, Mr. Francis' interview notes, and the depositions of quoted individuals

– Dr. Felix Canestri, Dr. Walter Matern, Dr. Gordon Margolin, Michael Bowen, and

Thomas Dilling – indicates that any altered quotations, as alleged by Dr. Patrick, simply

did not result in a "material change in the meaning conveyed by the [interviewees']

statement[s]."  Masson v. New Yorker Magazine, Inc., 501 U.S. at 517.  (Doc. 126; Doc.

116, Ex. WWW; Canestri Dep. Tr. 46-62; Margolin Dep. Tr. 68-77; Bowen Dep. Tr. 180-

190; Dilling Dep. Tr. 9-14).


**D.**      **False-Light Invasion of Privacy**

        Recently, the Ohio Supreme Court recognized the tort of false-light invasion of

privacy in Welling v. Weinfeld, 113 Ohio St. 3d. 464, 472 (2007).  In recognizing the tort

of false-light invasion of privacy the Welling court adopted Restatement of the Law 2d,

Torts, Section §652(E).  Welling explained the tort claim as involving

> one who gives publicity to a matter concerning another that places the
> other before the public in a false light is subject to liability to the other for
> invasion of his privacy if (a) the false light in which the other was placed
> would be highly offensive to a reasonable person, and (b) the actor had

knowledge of or acted in reckless disregard as to the falsity of the
publicized matter and the false light in which the other would be placed.

Welling, ¶61.  The <u>Welling</u> court further recognized that "[t]he requirements imposed by

the Restatement make a false-light claim difficult to prove."  <u>Welling</u>, ¶51.  The

"publicized" statement must be untrue and

it applies only when the defendant knows that the plaintiff, as a reasonable
man, would be justified in the eyes of the community in feeling seriously
offended and aggrieved by the publicity. . . .  The plaintiff's privacy is not
invaded . . . when the unimportant false statements are made, even when
they are made deliberately.  It is only when there is such a major
misrepresentation of his character, history, activities or beliefs that serious
offense may reasonably be expected to be taken by a reasonable man in
his position, that there is a cause of action for invasion of privacy.

<u>Welling</u>, ¶¶ 52, 55 (quoting Restatement of the Law 2d, Torts, Section 652E, Comment

c).  Further, as in the tort of defamation involving public figures, the <u>Welling</u> court places

the burden on the plaintiff to prove by clear and convincing evidence that the defendant

"had knowledge of or acted in reckless disregard as to the falsity of the publicized

matter and the false light in which the other would be placed," in cases of both private

and public figures.  <u>Welling</u>, ¶58 (quoting

Restatement of the Law 2d, Torts, Section 652E(b)).

The <u>Welling</u> court acknowledged a large and significant degree of overlap

between defamation and the tort of false-light, explaining that a plaintiff may pursue

both claims in the alternative, but may only recover for a single instance of publicity.

<u>Welling</u>, ¶57.  In this instance, where Mr. Patrick's false-light claim replicates his

defamation claim, the Court's preceding analysis disposing of the plaintiff's defamation

claims suffices to show that Dr. Patrick has also failed to establish, as a matter of law,

the reckless disregard of actual malice necessary to succeed in moving forward on this newly-recognized tort of false-light.

However, the Welling court made note of two areas in which the tort of false-light offers a remedy not otherwise offered through defamation.  The first involves disputes "where the defendant reveals intimate and personal, but false, details of plaintiff's private life," while the second "encompasses portrayals of the plaintiff in a more positive light than he deserves."  Welling, ¶39 (relying upon Denver Publishing Co. v. Bueno, 54 P.3d 893, 902-03 (Colo. 2002)).  The Court will consider these two areas as they bear on Mr. Patrick's claims.

Mr. Patrick's false-light claim is predicated on the allegation that the article, *Playing Doctor*, harmed the plaintiff by accusing him of "committing a crime, falsifying his resume, falsifying his credentials, and having been brought before the Ohio State Medical Board."  (Doc. 126).  As these allegations involve neither intimate or personal details of Mr. Patrick's private life, nor portray him in a more than deserving positive manner, the Court determines the plaintiff does not possess a remedy pursuant to false-light invasion of privacy.  Count Four of Mr. Patrick's Second Amended Complaint will be dismissed as a matter of law.


**E.     Invasion of Privacy by Publication of Private Facts**

The Ohio courts recognize a claim for invasion of privacy by publication of private facts.  See Housh v. Peth, 165 Ohio St. 35, 133 N.E.2d 340 (1956).  The tort of "publicity" is presented in The Restatement of Torts, §652D (Publicity Given to Private Life) as:

> One who gives publicity to a matter concerning the private life of another
> is subject to liability to the other for invasion of his privacy, if the matter
> publicized is of a kind that
>> (a) would be highly offensive to a reasonable person, and
>> (b) is not of legitimate concern to the public.

See also, Strutner v. Dispatch Printing Co., 2 Ohio App.3d 377, 442 N.E.2d 129 (1982).

To state a claim under this "publicity" tort requires: (1) there be publicity; (2) the facts disclosed must be those concerning the private life of an individual, not the public life; (3) the matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) the publication must have been made intentionally, not negligently; and, (5) the matter publicized must not be a legitimate concern to the public. See Killilea v. Sears, Roebuck & Co., 27 Ohio App. 3d 163, 166-67, 499 N.E.2d 1291 (10th Ohio App. 1985).

Courts have, further, refined these terms to require there be no liability, as a matter of law, when the defendant merely gives further publicity to information about the plaintiff that is already public, such as matters of public record about his birth or marriage date, or matters that the plaintiff leaves open to the public eye.  See Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 493-94 (1975); Jackson v. Playboy, 574 F. Supp. 10, 13 (S.D. Ohio 1983).  In addition, pursuant to the fifth element of this "publicity" tort a newspaper's publicizing "legitimate news" ordinarily will not be actionable.  Killilea v. Sears, Roebuck & Co., 27 Ohio App. 3d at 166-67.

In this instance, Mr. Patrick alleges the article, *Playing Doctor*, tortuously harmed him by intruding on his privacy when it published information concerning his medical residency and licensing.  However, a review of the record indicates that the publicized information concerned only Mr. Patrick's medical training and career, all matters of

-26-

public concern.  The regulation and licensing of physicians is not considered a private

matter, and the question, as presented in the article under dispute, of whether a

physician has completed a claimed training regime bears on the public concern for the

proper licensing of physicians.  Accordingly, the Court determines the plaintiff fails to

establish the prima facie elements of the tort of "publicity."  As a matter of law, the Court

dismisses Count Two of Mr. Patrick's Second Amended Complaint.


**F.     Establishing Actual Damages**

In Gertz, the United States Supreme Court determined "the States may not

permit recovery of presumed or punitive damages, at least when liability is not based on

a showing of knowledge of falsity or reckless disregard for the truth."  Gertz, 418 U.S.

349.  In this instance, Mr. Patrick has failed to establish the necessary actual malice

required by the Court in Gertz as a prerequisite to a recovery of punitive damages.  The

plaintiff's reliance upon Young v. Russ, 2007 WL 2822004 (11th Ohio App. 2007) and

Dunn and Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1988) are

inapposite.  (Doc. 126).

Without presumed damages the burden rests with Dr. Patrick to provide evidence

establishing that the article *Playing Doctor* was the proximate cause of injury, whether

that injury manifests itself as lost employment opportunity, reputational harm or mental

suffering.  Celebrezze v. Dayton Newspapers, Inc., 41 Ohio App. 3d 434, 346-47 (1988)

(noting that proximate cause created the burden of proving the defendant's conduct was

the sole source of an actual injury).  The record indicates that, with regard to the only

two possible lost employment opportunities, at Cumberland and Scott Memorial

Hospitals, the employer acted to terminate Dr. Patrick only after conducting independent investigations.  (Doc. 116, Ex. R, V, W).  That an anonymous package was mailed to both hospitals containing a collection of documents, including *Playing Doctor*, does not provide the requisite link to establish proximate cause for Dr. Patrick's termination at either Cumberland or Scott Memorial.  Further, the evidence is clear that Dr. Patrick did not seek mental health treatment subsequent to the publication of *Playing Doctor* (Doc. 116, Patrick Depo. Tr. 419), foreclosing damages for mental suffering.

### IV.    CONCLUSION

For the reasons set forth above, the motion for summary judgment brought by Mr. Francis and the <u>Scene</u> is granted, and this action is dismissed in its entirety. Further, as a result of the foregoing determination, the Court denies Mr. Patrick's motion for partial summary judgment.


IT IS SO ORDERED.


     /s/Lesley Wells
UNITED STATES DISTRICT JUDGE

-28-